UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RICHARD BRUCE GREENAWAY, JR., | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 3:17-cv-30156-KAR |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE COMMISSIONER'S DECISION
(Docket Nos. 14 & 16)

ROBERTSON, U.S.M.J.

## I. INTRODUCTION

Richard Bruce Greenaway, Jr., ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking review of a final decision of the Acting Commissioner of Social Security ("Commissioner") denying his application for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff asserts that the Commissioner's decision denying him such benefits – memorialized in a June 17, 2016 decision by an Administrative Law Judge ("ALJ") – is in error. Specifically, Plaintiff contends that the ALJ erred by not assessing his cervicalgia as a severe impairment. Plaintiff has moved for judgment on the pleadings requesting that the Commissioner's decision be reversed, or in the alternative, remanded for further proceedings (Dkt. No. 14). The Commissioner has moved for an order affirming the decision of the Commission (Dkt. No. 16). The parties have consented to this court's jurisdiction (Dkt. No. 13). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the

reasons stated below, the court will grant the Commissioner's motion for an order affirming the Commissioner's decision and deny Plaintiff's motion.

## II. PROCEDURAL BACKGROUND

Plaintiff applied for DIB and SSI on July 11, 2014, alleging a June 20, 2014 onset due to post-traumatic stress disorder ("PTSD") and depression.[1] His applications were denied initially and on reconsideration. He requested a hearing before an ALJ, and one was held on May 5, 2016. Following the hearing, the ALJ issued his decision on June 17, 2016, finding that Plaintiff was not disabled and denying his claims. The Appeals Council denied review, and the ALJ's decision became the final decision of the Commissioner. This appeal followed.

## III. LEGAL STANDARDS

### A. Standard for Entitlement to DIB and SSI

In order to qualify for DIB and SSI, a claimant must demonstrate that he is disabled within the meaning of the Social Security Act. A claimant is disabled for purposes of DIB and SSI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 1382c(a)(3)(A), 423(d)(1)(A). A claimant is unable to engage in any substantial gainful activity when he is not only "unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if

[1] A copy of the Administrative Record (referred to herein as "AR") has been filed under seal (Dkt. No. 11).

he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration ("SSA"). *See* 20 C.F.R. § 404.1520(a)(4)(i-v).[2] The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience. *Id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process). If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. 20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's residual functional capacity ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work in the national economy. *Id.*

> RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities.

Social Security Ruling ("SSR") 96-8P, 1996 WL 374184, at *2 (July 2, 1996).

[2] The administrative regulations applicable to Title II (DIB) are found in 20 C.F.R. Part 404, while the regulations applicable to Title XVI (SSI) are found in 20 C.F.R. Part 416. Because the Title II and Title XVI regulations do not differ substantively, the court generally refers solely to the Title II regulations in this Memorandum and Order.

The claimant has the burden of production and proof through step four of the analysis, including the burden to demonstrate RFC. *Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8 (D. Mass. Sept. 5, 2013) (citing *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001)). At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding his or her restrictions and limitations. *Goodermote*, 690 F.2d at 7.

B. Standard of Review

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law *de novo*, but "the ALJ's findings shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (mem.) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted)). "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003)). In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *See Applebee,* 744 F.

App'x. at 6. That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

## IV. Relevant Facts

### A. Plaintiff's Background

Plaintiff was 37 on the date of his hearing before the ALJ. He had at least a high school education and lived with his wife and two young children. He had not worked since June 20, 2014, the alleged onset date. Prior to June 2014, he had worked as a dispatcher, an emergency medical technician, and a firefighter (AR 68).

### B. Medical Records Relevant to Plaintiff's Claims

The court summarizes portions of the medical history that appear most relevant to Plaintiff's claim of error, which are the records related to Plaintiff's cervicalgia.

On February 5, 2015, Plaintiff saw Antone Cruz, M.D., at the Riverbend Medical Group for treatment for shoulder pain that developed two or three days earlier (AR 466). Cruz noted tenderness in the shoulder and at the bursa, as well as pain with flexion, extension, and rotation (AR 468). Cruz ordered an x-ray of the shoulder, which revealed mild degenerative changes with no acute findings (AR 470).

On February 25, 2015, Plaintiff returned to Riverbend Medical Group, this time seeing Physician's Assistant Albert Ventulett about his shoulder pain (AR 464). Plaintiff reported the pain, which radiated up to his neck and down his right arm, as constant and worse with movement (AR 466). Ventulett found impingement in the right shoulder with limited abduction and forward flexion. He diagnosed Plaintiff's condition as shoulder impingement syndrome (AR 465). Plaintiff proceeded with a cortisone injection that day and Ventulett prescribed physical therapy (AR 465-66). Plaintiff was referred to Attain Therapy and Fitness on the basis of his

shoulder pain (AR 442). He attended ten physical therapy sessions between March 10 and April 9, 2015 (AR 454). His functional limitations arising from shoulder pain were identified as hygiene, dressing and bathing, household chores, driving community distances, pulling and pushing objects, reaching, and lifting his 20-pound son (AR 440). These limitations were reported as unchanged over ten visits (AR 420, 423, 425, 427, 429, 431, 433, 437, 442). Plaintiff's report of pain varied over the visits, ranging from a low of four to a high of eight on a ten-point scale. Some days Plaintiff was able to tolerate his exercises well, despite experiencing increased pain (AR 429). At his tenth visit, Plaintiff's physical therapist noted that Plaintiff reported a 40-45% improvement since starting physical therapy, especially with regard to his range of motion. (AR 420). The numbness in Plaintiff's arm was unchanged. He found pushing and lifting objects to waist level easier but reaching or lifting overhead was "difficult/painful," as was pulling objects (AR 420).

On March 30, 2015, Plaintiff returned to Riverbend Medical Group, reporting numbness and tingling in his right arm and neck and that physical therapy was ineffective (AR 462). Ventulett noted tenderness in the post cervical muscles, found mild degenerative changes, and recorded an impression of cervicalgia. He referred Plaintiff to physiatry and ordered a second x-ray, this time of Plaintiff's neck and spine. The reading radiologist noted that the x-ray revealed "reversal of cervical lordosis consistent with muscle spasm. There [were] no appreciable degenerative changes" (AR 469).

On April 16, 2015, Plaintiff saw Ronald N. Paasch, M.D., at Pioneer Spine and Sports Physicians for his shoulder and neck pain and intermittent numbness throughout his right upper extremity (AR 510). Plaintiff reported that he found physical therapy helped with the range of motion in his shoulder but did not help the numbness or discomfort (*id.*). Upon examination,

Plaintiff showed no significant pain with certain manipulations of his neck and shoulder. He had discomfort in his neck with extension and rotation to the right and had tenderness in the lower right cervical paraspinal musculature (AR 511). Plaintiff also had pain in his shoulder over the acromioclavicular joint and with palpitation over the bicipital groove area, as well as at the end of external rotation (AR 511). Plaintiff's shoulder pain increased with stressing of the rotator cup capsule. Paasch noted that Plaintiff's shoulder showed no obvious instability and the motor strength was intact. The doctor assessed cervicalgia and bursae and tendon disorders in the shoulder region, unspecified (AR 512).

Plaintiff returned to see Paasch on May 18, 2015 for follow-up as to his shoulder and neck discomfort. He reported that the physical therapy helped with the range of motion for his shoulder, but not with the pain and discomfort. Plaintiff stated that he had been noticing worsening hand pain and weakness and was dropping things (AR 507). Paasch noted that Plaintiff had no significant pain with cervical or lateral flexion or extension, but some discomfort with extension and rotation to the right (AR 508). The doctor again found tenderness in the lower right cervical paraspinal musculature. Plaintiff returned to Paasch on July 22 and August 14, 2015, with the same complaints (AR 500-06).

On June 25, 2015, Plaintiff saw Sumner E. Karas, M.D., at New England Orthopedic Surgeons for a consultation. The doctor described Plaintiff as presenting with "a lot of neck pain" that worsened with movement of the head or neck (AR 414). Karas' notes indicate that Plaintiff's "cervical motions [were] moderately restricted and irritable and in fact what [wa]s particularly concerning … [wa]s that far more of his pain [wa]s reproduced with movements of the head and neck than with movements of the shoulder itself" (*id.*). Plaintiff said he had a lot of discomfort at night. Karas noted that the MRI of Plaintiff's neck demonstrated mild

degenerative change mid cervical segments. An injection administered that day resulted in a slightly improved tolerance of manipulation of the shoulder but most of the pain concentrated in his neck went unchanged (AR 415). Karas recorded his impression as cervicalgia with cervical brachial discomfort, which the doctor did not think stemmed from any shoulder problem. As long as "the predominance of the pain [occurred] with movements of the head and neck," Karas did not believe he would "be able to alleviate any pain that's intrinsic or referred from the cervical spine, or with any intervention of the shoulder" (AR 415).

On or around August 1, 2015, Paasch ordered an MRI of Plaintiff's cervical spine. The MRI findings included minimally reversed lordosis at C3-C4, but no visible fracture or subluxation; disc desiccation from C3-C4 to C5-C6 levels; and minimal irregularities of endplates from C2-C3 through C6-C7 (AR 519). The MRI also revealed a small left paracentral herniated disc at C2-C3 and a tiny central protruded disc at C3-C4, with mild uncontroverted joint osteophytes bilaterally and no stenosis or neural foramen narrowing (AR 519). Finally, there was minimal uncovertebral joint osteophytes bilaterally at C4-C5 and mild uncovertebral joint osteophytes bilaterally at C5-C6, with mild disc bulge. The doctor listed his overall impression as mild cervical spondylosis (AR 520).

On August 5, 2015, Plaintiff was evaluated at Pioneer Spine and Sports Physicians by physical therapist David Trotman. Trotman noted that Plaintiff had biomechanical and postural deviations at the cervical/thoracic spine, limited cervical active range of motion, and "persistent [right] upper quadrant/paracervical pain, all leading to decreased functional mobility" (AR 484). Plaintiff's shoulder range of motion was within functional limits. Plaintiff stated that his pain ranged from a 10 at the worst to an 8 at the least, disturbed his sleep, and was aggravated with various activities. Plaintiff had found no way to alleviate his pain (AR 483). He had five

additional physical therapy appointments in August (AR 476-82), during which he tolerated the exercises well but continued to report high levels of pain. At his September 14, 2015 visit, Plaintiff stated that his neck was still sore but "better overall" (AR 474).

On September 23, 2015, Plaintiff received C4-5, C5-6, and C6-7 facet injections for his chronic neck pain (AR 498-99). When he returned to see Paasch again on October 12, 2015, Plaintiff reported that the facet injections were not helpful (AR 495). On November 12, 2015, Plaintiff received a cervical interlaminar injection for cervical radiculitis (AR 494). At his follow-up appointment on November 30, 2015, Plaintiff reported to Paasch that the injection was only temporarily helpful (AR 491). On January 26, 2016, Plaintiff saw Paasch again. Plaintiff told the doctor that, while his shoulder pain had improved, he continued to have right-sided neck pain with rotation to the right side (AR 488). The doctor noted that Plaintiff had obtained a surgical consultation and was not recommended for any surgical intervention. Plaintiff received another round of facet injections on February 11, 2016 (AR 554).

Plaintiff returned to see Paasch on February 25, 2016 and reported that the injections did not improve his pain (AR 553). The visit notes reflected that Plaintiff reported continued "right-sided neck pain with rotation to the right side" (AR 551). For Plaintiff's care plan, Paasch wrote that Plaintiff was "not a surgical candidate and conservative treatment so far ha[d] been ineffective" (AR 553). The doctor ordered a further MRI, which took place on March 1, 2016 (AR 555). Following the MRI, Plaintiff saw physician's assistant Joseph Chappell who reviewed the findings with Plaintiff and noted that the MRI was "essentially" the same as the previous year's, with minimal degenerative changes. There was "no evidence of nerve root impingement or stenosis seen" and the "[f]indings [were] considered minimal" (AR 550).

Chappell noted that Plaintiff reported that his neck pain was "bilateral" and that he was "seeking disability for his psychiatric issues" (AR 548).

C. Opinion Evidence

1. Consultative Examination

On March 7, 2015, Plaintiff saw Lucas Donovan, M.D., for a consultative examination based on complaints of right shoulder pain, PTSD, and depression (AR 579-81). The doctor noted limited right shoulder range of motion. Donovan opined that

> [t]here [were] no limitations on [Plaintiff's] ability to sit, stand or walk in an eight-hour workday with normal breaks. There is a limitation in his ability to lift and carry throughout the workday secondary to decreased range of motion in the right upper extremity. There are no limitations in bending, stooping or crouching. No manipulative limitations to reaching, handling or grasping (AR 581).

2. State Agency Opinion

On March 10, 2015, state agency consultant Lucinda Wheelock, M.D., reviewed Plaintiff's claim on reconsideration (AR 154-56). Wheelock assessed Plaintiff as having the RFC of only occasionally lifting or carrying 20 pounds, frequently lifting and carrying ten pounds, and standing or walking for six hours and sitting for six hours in an eight-hour workday with normal breaks (AR 155). Wheelock further assessed Plaintiff as limited to no more than occasional crawling and limited reaching to the right in front, laterally, or overhead because of Plaintiff's right shoulder (AR 156).

D. Hearing Testimony

At the hearing, Plaintiff testified about the impact his neck pain had on his everyday life. He described the pain as a stabbing pain that originated in the base of his skull and traveled down his shoulder (AR 103). He found it painful to keep his neck straight without support and experienced a lot of pain when he turned his head to the right (AR 101, 104). This pain limited

Plaintiff in activities of daily living, such as lifting his children, putting away dishes in upper cabinets, carrying laundry up and down stairs, holding heavy objects and opening jars (AR 101, 106). Plaintiff reported that the many injections he received in the cervical area did not provide him any relief from pain and that he was not a candidate for surgery (AR 103). He said that he could only sit comfortably in one position for about a half hour before he had to adjust his position; that he could stand comfortably for about an hour; and that he could walk for about a half mile on an even surface (AR 108-09, 115).

The vocational expert ("VE") answered a hypothetical question with modifications from the ALJ. The ALJ asked the VE to assume an individual of Plaintiff's age and education with his past employment as a firefighter, EMT, and dispatcher, but who is limited to:

> less than the full range of light work, the standard exertional limits for light work; however the individual would be limited to no more than occasional reach overhead or in any direction with the right, upper extremity and no more than occasional climbing of ladders, ropes or scaffolds, no more than occasional crawling. This individual would be limited to simple, routine tasks, simple, work-related decisions and would only occasionally have to interact with supervisors, coworkers or the public (AR 120).

The VE opined that Plaintiff could not perform his past work, but that there were light, unskilled occupations including office cleaner, inserter, or floral care worker that he would be able to perform (AR 121).

The ALJ modified the hypothetical by adding the exertional limitations of "sit/stand option so that this individual would be allowed to stand for five minutes, after every hour of sitting; would be allowed to sit for five minutes after every 30 minutes of standing or walking" (AR 122). The VE stated that, except for the floral care position, the individual could perform the positions previously identified. In the third variation, the ALJ added the limitation of no more than frequent handling or fingering by the right, dominant hand (*id.*). The vocational

expert said that the hypothetical individual could still perform the positions of inserter and office cleaner (AR 123). Finally, the VE said that the individual would not be able to perform any job in the national economy if he was off task for 15% or more of the time in a normal workday or would miss three or more days of work each month (AR 123).

E. The ALJ's Decision

The ALJ conducted the five-part analysis required by the regulations. *See* 20 C.F.R. § 404.1520(a)(4)(i-v); *see also Coskery v. Berryhill*, 892 F.3d 1, 2-3 (1st Cir. 2018). At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of June 20, 2014 (AR 61). *See* 20 C.F.R. § 404.1571 *et seq.* At step two, the ALJ found that Plaintiff had the following severe impairments: low back pain, rotator cuff injury, carpal tunnel syndrome, and posttraumatic stress disorder/anxiety disorder (AR 61). *See* 20 C.F.R. §§ 404.1520(c) & 416.920(c). The ALJ did not mention cervicalgia. For purposes of step three, he concluded that Plaintiff's impairments, either alone or in combination, did not meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (AR 61-62). The ALJ determined that Plaintiff's mental health impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, as required to satisfy the Paragraph B criteria (AR 62). The ALJ further concluded that there was no evidence to show that the Paragraph C criteria were satisfied.

Before proceeding to step four, the ALJ found that Plaintiff had the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)[3] with additional limitations. The ALJ

---

[3] Light work is defined as work that requires "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

found that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand, or walk for six hours during an eight-hour day; and push and/or pull within the weight parameters of lifting and carrying. Plaintiff would need to sit for five minutes after every thirty minutes of standing or walking. Positions identified could not require frequent handling or fingering with the right (dominant) hand and could require no more than occasional climbing of ladders/ropes/scaffolds or crawling. Plaintiff was further limited to simple, routine tasks; simple work-related decisions; and no more than occasional interaction with supervisors, coworkers, or the public (AR 63).

In formulating Plaintiff's RFC, the ALJ took into account Plaintiff's testimony about his back, neck and shoulder pain and the carpal tunnel syndrome affecting his right wrist, reports of MRIs, an x-ray, and treatment records reflecting examinations, injections, and physical therapy related to Plaintiff's neck and shoulder pain, as well as Donovan's March 7, 2015 consultative examination, to which he accorded "partial" weight, and Wheelock's March 10, 2015 record review and RFC assessment. At step four, the ALJ found that Plaintiff was unable to perform his past work (AR 68). Relying on the VE's testimony, he found that there were jobs that existed in significant numbers in the national economy that Plaintiff would be able to perform notwithstanding his restrictions (AR 69). Accordingly, he concluded that Plaintiff was not disabled (AR 69-70).

## V. Analysis

Plaintiff's sole argument on appeal is that the ALJ erred by not finding cervicalgia to be a severe impairment. Had the ALJ done so, Plaintiff contends, the RFC might have been more restrictive and might have resulted in a different opinion about Plaintiff's employability from the VE. As set forth above, step two of the sequential evaluation process requires the Commissioner

to determine whether a claimant possesses a severe impairment. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 404.1520(a)(4)(ii). For an impairment to be "severe," a plaintiff must provide evidence that it significantly limits his or her physical or mental ability to perform basic work activities. *See* 20 C.F.R. § 416.920(c); 20 C.F.R. § 404.1520(c). It is not clear on this record that the ALJ failed to identify Plaintiff's cervicalgia as a serve impairment at step two, although he did not use that term. Cervicalgia means, quite simply, neck pain. *See* YourDictionary, https://www.yourdictionary.com/cervicalgia (last viewed March 26, 2019). The treatment notes and records were ambiguous as to the source of Plaintiff's neck pain. He complained of pain that originated in his neck and traveled to his shoulder (AR 103). Treatment for the problem began with a February 5, 2015 visit to Cruz for treatment for shoulder pain (AR 466). In March 2015, Plaintiff was referred to Donovan for a consultative examination based on complaints of right shoulder pain (AR 579-81) and Karas evaluated Plaintiff's shoulder as the source of the pain of which he was complaining (AR 415). Karas noted that Plaintiff's MRI showed a "partial articular surface tear of the anterior aspect of the supraspinatus" (AR 414), or, in other words, a partial tear of the rotator cuff. When the ALJ found rotator cuff injury to be one component of Plaintiff's combination of severe impairments, he was almost certainly referring to the shoulder and neck pain that Plaintiff began experiencing in March 2015 (AR 61).

Even if the ALJ erred in not including Plaintiff's cervicalgia on the list of severe impairments, "any error at step two was harmless because the evaluation proceeded past step two and the ALJ considered all of Plaintiff's impairments at step four." *Majors v. Colvin*, Civ. Action No. 12-40166-TSH, 2014 WL 551019, at *7 (D. Mass. Feb. 7, 2014) (citing *Noel v. Astrue*, 2012 WL 2862141 (D. Mass. 2012)). *See also* 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your

medically determinable impairments that are not 'severe' … ."). The ALJ reviewed a majority of Plaintiff's medical records related to treatment for his should and neck pain in the section of the decision captioned "Physical" (AR 66-68). "The hearing officer is not required to – nor could he reasonably – discuss every piece of evidence in the record." *Sousa v. Astrue*, 783 F. Supp. 2d 226, 234 (D. Mass. 2011) (citing *Nat'l Labor Relations Bd. v. Beverly Enters.– Mass.,* 174 F.3d 13, 26 (1st Cir.1999)).

Because step two's "severity requirement is . . . a *de minimus* policy, designed to do no more than screen out groundless claims," *McDonald v. Sec'y of Health & Human Servs.,* 795 F.2d 1118, 1124 (1st Cir. 1986), the ALJ's finding that Plaintiff had other severe impairments is all that step two required as long as the ALJ considered all of Plaintiff's functional limitations in crafting the RFC. *See Heatley v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 824-25 (11th Cir. 2010) (per curiam); *Coe v. Colvin,* Civ. Action No. 15-30037-MGM, 2016 WL 3350995, at *6 (D. Mass. June 15, 2016). By finding that Plaintiff's RFC was restricted to light work in positions requiring "no more than occasional reaching, including overhead, with the right (dominant) upper extremity," providing for the ability to change positions frequently, and limiting climbing and crawling, the RFC took into account functional limitations attributable to Plaintiff's cervicalgia, and Plaintiff fails to identify any additional limitations attributable to this condition that should have been addressed. Thus, "any error in failing to explicitly include [cervicalgia] in the list of severe impairments was harmless because the ALJ appropriately considered [it] throughout the evaluation process and accounted for the impairment in his determination of Plaintiff's RFC." *Coe,* 2016 WL 3350995, at *6 (citing *Perez v. Astrue,* Civ. Action No. 11-30074-KPN, 2011 WL 6132547, at *4 (D. Mass. Dec. 7, 2011)). *See Newman v. Astrue*, Civ. Action No. 5:06-cv-00955, 2008 WL 4298550, at *16 (S.D.W.V. Sept. 18, 2008) (finding the

ALJ's omission of claimant's myofascial pain syndrome at step two harmless where the ALJ considered the condition individually under the Listings and in assessing the claimant's RFC); *see also Allen v. Berryhill*, Civ. Action No. 16-40058-TSH, 2017 WL 4390263, at *3 (D. Mass. Sept. 29, 2017).

The record also supports the ALJ's determination that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record" (AR 64). The ALJ did not wholly discount Plaintiff's reports of pain. He recognized, however, that Plaintiff's reports of pain to his medical providers reflected improvement over time, even if the symptoms did not resolve entirely. For example, on his last visit to physical therapy in September 2015, Plaintiff reported that, although his neck was still sore, it felt "better overall" (AR 474). Treatment notes from February 26, 2016, recorded Plaintiff as describing his pain as "slight achiness in the neck" (AR 551).

Plaintiff does not, and could not reasonably, argue that the ALJ's decision was not supported by substantial evidence. There was no opinion evidence from a treating health care provider assessing functional limitations attributable to Plaintiff's cervicalgia. The ALJ gave partial weight to the opinion from consulting examiner Donovan, who opined that there were no limitations in Plaintiff's ability to sit, stand, or walk in an eight-hour day, some limitations in his ability to lift and carry, and no limitations in his ability to reach, handle, or grasp (AR 66). The ALJ assigned great weight to the state agency reconsideration assessment by Wheelock because the functional limitations she assessed in arriving at an RFC were consistent with the medical evidence of record (AR 68). "An ALJ 'must consider findings and other opinions of [s]tate agency medical and psychological consultants … as opinion evidence' because [s]tate agency

medical and psychological consultants … are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation.'" *Harding v. Colvin*, Civ. Action No. 12-11437-DJC, 2015 WL 8082386, at *12 (D. Mass. Dec. 7, 2015) (quoting 20 C.F.R. § 404.1527(e)). Wheelock's opinions were the result of reviewing a substantial portion of the medical records that were submitted to the Commissioner concerning Plaintiff's cervicalgia, including the results of Donovan's consultative examination (AR 162-66). "[T]he opinions of non-treating medical examiners can be entitled to substantial weight where they had only most, but not all, of the evidence for their review." *D.A. v. Colvin*, No. 11-cv-40216-TSH, 2013 WL 5513952, at *8 (D. Mass. Sept. 30, 2013). The ALJ did not err in assigning great weight to Wheelock's opinion, *see Harding*, 2015 WL 8082386, at *12, which, with the remainder of the records related to Plaintiff's cervicalgia, constituted substantial evidence supporting his decision. *See Allen*, 2017 WL 4390263, at *3.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's motion for an order reversing the Commissioner's decision is DENIED, and the Commissioner's motion to affirm the decision is GRANTED. Judgment shall enter for the defendant, and the Clerk's Office is directed to close the case on the court's docket.

It is so ordered.

Dated: March 27, 2019

Katherine A. Robertson
KATHERINE A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE